UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| VIRGINIA IRIS HUSS, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | No. 1:23-cv-01435-JMS-MKK |
| *vs.* | ) | |
| | ) | |
| SHARKNINJA OPERATING LLC, | ) | |
| | ) | |
| *Defendant.* | ) | |

## ORDER

While making a fudge recipe, Plaintiff Virginia Huss used a Ninja BL660 blender designed, manufactured, and sold by Defendant SharkNinja Operating LLC ("SharkNinja") to blend a mixture of chocolate chips that she had microwaved for 60 to 90 seconds.  After blending, Ms. Huss attempted to twist open the blender lid and the lid shot off the blender cup, causing scalding hot fudge to explode and burn Ms. Huss's face, chest, arms, and hands.  Ms. Huss initiated this action against SharkNinja, asserting various claims under the Indiana Product Liability Act, Ind. Code §§ 34-20-1-1 to -9-1 ("IPLA").  [Filing No. 11.]  SharkNinja has filed a Motion to Exclude Expert Testimony of Derek King and a Motion for Summary Judgment, both of which are ripe for the Court's consideration.  [Filing No. 63; Filing No. 65.]

**I.**
**SCOPE OF MS. HUSS'S CLAIMS**

At the outset, the Court sets forth the parameters of Ms. Huss's remaining claims.  Ms. Huss originally asserted claims under the IPLA for a design defect, a manufacturing defect, and a failure to warn of the dangers of using the blender, but abandoned the manufacturing defect and failure-to-warn claims in her response to SharkNinja's Motion for Summary Judgment.  [Filing

No. 71 at 13 (Ms. Huss stating "[b]ased on the existing record,…Plaintiff concedes her manufacturing defect claims and failure-to-warn defect claims….  Plaintiff respectfully asks that her design defect claims, and negligence claims remain intact.").][1]  SharkNinja filed its Motion to Exclude and its Motion for Summary Judgment simultaneously, and portions of its briefs apply to claims that Ms. Huss has since abandoned.  The Court only addresses the pending motions as they relate to Ms. Huss's remaining design defect claim under the IPLA.

The only design defect theory that Ms. Huss posits in her Amended Complaint is that the blender's fast-moving blade heats cool or room temperature food which creates friction and, ultimately, causes the blender contents to explode when the user opens the blender cup (the "Cool to Explosively Hot Theory").  Ms. Huss supports her Cool to Explosively Hot Theory with the following allegations in the Amended Complaint:

- The blender is defectively designed because "the extremely fast-moving blade of the blenders heat the contents of the sealed bullet-shaped canister, which can (and does) unexpectedly explode when being used in its normal and intended manner by consumers….  In a matter of [a] short amount of time, the fast-spinning blades can unexpectedly heat up its contents, such that if the blender explodes, the user is at risk of severe burns or lacerations and injuries requiring medication attention."  [Filing No. 11 at 1-2.]

- "During the normal, as-directed use of [the blender], a consumer puts cool or room temperature food into the plastic 'bullet' cup.  Once the cup is secured to the blade assembly and placed onto the unit's base, the user is able to run the blender by pressing down on the cup.  The blades then rotate, creating friction as they cut and chop the cup's contents, which in turn causes the contents to heat up."  [Filing No. 11 at 4.]

---

[1] Although Ms. Huss refers to a "negligence" claim, she only asserts claims under the IPLA in the operative First Amended Complaint.  [Filing No. 11 at 6-8.]  In any event, her design defect claim under the IPLA is evaluated using a negligence standard.  *Kaiser v. Johnson & Johnson*, 947 F.3d 996, 1008 (7th Cir. 2020).

- "As the temperature rises inside the cup, the pressure from the frictional energy also rises. The temperature can get so hot that the pressure inside the cup forces the cup to separate from the blade while the blender is still running. This can cause the hot contents of the cup to explosively project outward without warning, landing on anyone and anything nearby." [Filing No. 11 at 4.]

- "Even if the cup does not separate from the blender while in use, the user is still at risk. If the contents of the cup are hot and under pressure when the cup is opened, the hot contents can again be explosively ejected onto the user, causing se[ve]re lacerations from a detached blade." [Filing No. 11 at 4.]

Mr. King sets forth three other design defect theories in his Expert Report: (1) that the threaded connection between the blender cup and the blade assembly is "susceptible to slippage and so it may separate…before venting can occur" (the "Thread Slippage Theory"), [Filing No. 63-1 at 5]; (2) that "the threaded connection was under load (from internal pressure) and also at an elevated temperature" and "[i]t is likely that one or both materials experienced some softening due to temperature which contributed to the threads failing to keep the blade assembly fastened to the cup long enough for the pressure to vent" (the "Softening Materials Theory"), [Filing No. 63-1 at 10]; and (3) that Ms. Huss had observed that the blade assembly "kind of untwists itself the rest of the way," which Mr. King found was "consistent with the force from internal pressure being transferred into a rotational motion due to the slope of the threaded connection between the cup and blade assembly" (the "Spontaneous Untwisting Theory"), [Filing No. 63-1 at 6].

As to each of these theories, the Court considers whether Mr. King's expert opinion should be excluded and whether SharkNinja is entitled to summary judgment.

## II.
### MOTION TO EXCLUDE

### A.    Applicable Law

Federal Rule of Evidence 104 instructs that "[t]he court must decide any preliminary question about whether a witness is qualified…or evidence is admissible." Fed. R. Evid. 104(a).

Federal Rule of Evidence 702, which was amended effective December 1, 2023, provides that expert testimony is admissible if "the proponent demonstrates to the court that it is more likely than not that: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702.    While "[n]othing in the amendment imposes any new, specific procedures," the Committee Notes reflect that the purpose of the amendment was to clarify and emphasize: (1) the applicability of the "preponderance of the evidence standard," that is, that "expert testimony may not be admitted unless the proponent demonstrates to the court that it is more likely than not that the proffered testimony meets the admissibility requirements set forth in [Rule 702]"; and (2) that "each expert opinion must stay within the bounds of what can be concluded from a reliable application of the expert's basis and methodology." Fed. R. Evid. 702 advisory committee's note to 2023 amendment.

A trial judge "must determine at the outset…whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue.  This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue…. Many factors will bear on the inquiry." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592-93 (1993).  The Court has a "gatekeeping obligation" under Rule 702 and "must engage in a three-step analysis before admitting expert testimony.  It must determine whether the witness is qualified; whether the expert's methodology is scientifically reliable; and whether the testimony will 'assist the trier of fact to understand the evidence or to determine a fact

in issue.'" *Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 779 (7th Cir. 2017) (quoting *Myers v. Ill. Cent. R.R. Co.*, 629 F.3d 639, 644 (7th Cir. 2010)).  Put another way, the district court must evaluate: "(1) the proffered expert's qualifications; (2) the reliability of the expert's methodology; and (3) the relevance of the expert's testimony." *Gopalratnam*, 877 F.3d at 779 (emphasis omitted).  The Seventh Circuit Court of Appeals "give[s] the district court wide latitude in performing its gate-keeping function and determining both how to measure the reliability of expert testimony and whether the testimony itself is reliable." *Bielskis v. Louisville Ladder, Inc.*, 663 F.3d 887, 894 (7th Cir. 2011).  Given the amendment to Rule 702, the Court must also determine whether the proponent has made the requisite showing under the "more likely than not" standard.

### B.     Summary of Mr. King's Opinion

Mr. King has a Bachelor of Science degree in Mechanical Engineering from the University of California, Berkeley and a Master of Science in Electrical Engineering from Ohio University. [Filing No. 63-1 at 3.]  He has worked as an engineer for Berkely Engineering and Research since 2009 "in the areas of failure analysis, design, and risk assessment of consumer and industrial equipment, including industrial pressure vessels and consumer propane tanks, pressure cookers and blenders."  [Filing No. 63-1 at 4.]

Mr. King describes the incident underlying this litigation as follows:

On August 23rd, 2021, Ms. Virginia Huss was preparing a simple fudge recipe. After microwaving chocolate chips (and possibly also the condensed milk), she decided to blend the ingredients to get a better consistency using her Ninja blender…. She poured the mixture into a single-serve cup and described blending for about one minute.  When she removed the cup assembly and began to twist open the blade attachment, she observed that the attachment was tighter than when she installed it.  As she rotated the attachment, she felt it begin to rotate itself just before the contents were expelled onto her face, neck, chest, and arms, as well as onto the kitchen walls.

[Filing No. 63-1 at 3.]

Mr. King was tasked with providing his opinions regarding the following topics:

- "[W]hether or not the blender would enable and allow the incident to occur"; and

- "[W]hat design aspects of the subject blender enable and/or fail to mitigate the risks of pressurization and burn injury."

[Filing No. 63-1 at 5.]

By "applying well-established engineering principles" and performing "exemplar testing," Mr. King concluded that "a sealed blender cup will heat and pressurize due to the blending process, thus establishing the possibility that the subject blender could create the hazard and risk consistent with Ms. Huss' description." [Filing No. 63-1 at 5.] Mr. King further opined that:

> Examination and testing show that the pressurization condition is not controlled or indicated through any design features. A[ ] potential opportunity for venting before sudden separation is present in the intermittent thread design, however, geometric analysis shows that the threaded connection is susceptible to slippage and so it may separate (as in the subject incident) before venting can occur. Other mitigating options found on other products, such as pressure relieving valving, lid-capture designs, or run-time limiting controls, are absent.

[Filing No. 63-1 at 5.]

As to his "exemplar testing," Mr. King provided a spreadsheet which reflects the following headings: (1) T(s); (2) External ºF; (3) Internal ºF; (4) Pressure PSI; (5) Note; (6) T-start; and (7) Recipe. [Filing No. 63-2.] Oddly, Mr. King provides no explanation whatsoever in his Report regarding the meaning of the headings, exactly what the variables of his tests were, and what the outcomes of his tests were. [*See* Filing No. 63-1.] SharkNinja describes Mr. King's test results as follows:

- "[T]he only testing of the incident recipe that [Mr.] King conducted involved blending a chocolate-chip mixture heated to 121ºF. But this testing did not result in any pressurized ejection of hot content." [Filing No. 64 at 3.]

- "[Mr.] King blended incident recipe ingredients that were preheated to 121ºF for one minute and 49 seconds in a BL660 single-serve cup, and this testing did

not demonstrate any explosive projection of the cup's contents." [Filing No. 72 at 3.]

Ms. Huss does not dispute SharkNinja's characterizations of Mr. King's testing and does not otherwise discuss the testing other than to assert that Mr. King considered Ms. Huss's testimony that the chocolate chips were "lukewarm" temperature and "applied it to his analysis." [Filing No. 70 at 9.]  Absent an explanation from Mr. King or Ms. Huss – or disagreement regarding SharkNinja's characterization – of the meaning of the data contained on Mr. King's testing spreadsheet or how the testing was carried out in general and what results it yielded, the Court proceeds to analyze Mr. King's opinion with the following premise in mind:  Mr. King's testing involved blending ingredients that had previously been heated to 121ºF for one minute and 49 seconds, and that testing did not result in an explosive projection of the blender's contents.

C.    **Discussion**

1.    *Whether Mr. King Is Qualified*

Rule 702 allows the opinions of witnesses who have the requisite "knowledge, skill, experience, training, or education."  SharkNinja does not challenge Mr. King's qualifications as to his design defect opinions.  Nonetheless, the Court finds, in accordance with its gate-keeping obligation and the standard set forth in Rule 702, that Mr. King's undergraduate and graduate degrees in mechanical and electrical engineering along with his work experience since 2009 "in the areas of failure analysis, design, and risk assessment of consumer and industrial equipment, including…blenders" is sufficient to qualify him to testify regarding design defects in blenders. [Filing No. 63-1 at 4.]  The Court goes on to consider whether Ms. Huss has sustained her burden of showing that it is more likely than not that Mr. King's methodology is scientifically reliable and that his testimony will aid the trier of fact.

### 2.    *Whether Mr. King's Methodology Is Scientifically Reliable*

The United States Supreme Court in *Daubert* set forth four factors a court may consider when determining whether an expert witness's methodology is reliable, including: (1) whether the methodology "can be (and has been) tested"; (2) whether the methodology "has been subjected to peer review and publication"; (3) the "known or potential rate of error"; and (4) whether the methodology is generally accepted. *Daubert*, 509 U.S. at 593-94. These factors are not a "definitive checklist or test," *id.* at 593, and the weight of the factors is dependent on "the particular circumstances of the particular case at issue," *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 150 (1999). The key focus "is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id.* at 152.

### a.    Cool to Explosively Hot Theory

SharkNinja argues that Mr. King does not have a reliable foundation to provide expert testimony regarding the Cool to Explosively Hot Theory because he did not conduct any testing with cool or room temperature ingredients. [Filing No. 64 at 6.] It asserts that Mr. King's test involved blending a mixture of chocolate chips, sweetened condensed milk, and vanilla extract preheated to 121ºF for one minute and 49 seconds in a BL660 single-serve cup blender and that even though he started with preheated ingredients (versus cool or room temperate ingredients) and blended the ingredients longer than Ms. Huss did (one minute and 49 seconds versus "probably less than a minute"), "his testing did not demonstrate any explosive projection of the cup's contents." [Filing No. 64 at 6.] Accordingly, it argues, Mr. King "should be precluded from opining that blending cool or room temperature ingredients for any length of time can result in

'contents being forcefully expelled from the blending cup under pressure and at high temperature.'"

[Filing No. 64 at 6.]

Ms. Huss argues in her response that any failure to test cool ingredients is a credibility determination for the jury. [Filing No. 70 at 10.] She contends that physical testing is not required for an expert's opinion to be admissible. [Filing No. 70 at 11-12.]

In its reply, SharkNinja argues that not only did Mr. King not test the Cool to Explosively Hot Theory, he also did not otherwise evaluate the theory, which is a "methodological gap that has previously rendered [his] design-defect opinions inadmissible in other product-liability cases in this Circuit." [Filing No. 72 at 4 (citation omitted).] It asserts that Ms. Huss does not identify any mathematical model or any other supportive testing from Mr. King's report that supports the Cool to Explosively Hot Theory. [Filing No. 72 at 4.] It acknowledges that the Seventh Circuit has recognized that physical testing or recreation is not always feasible or prudent, but notes that Mr. King did conduct testing using preheated ingredients. [Filing No. 72 at 4.]

The Court first considers Ms. Huss's argument that the jury can decide for itself whether Mr. King's methodology is reliable. The advisory committee's notes to the 2023 amendment to Rule 702 specifically address this argument, stating:

> [M]any courts have [incorrectly] held that the critical questions of the sufficiency of an expert's basis, and the application of the expert's methodology, are questions of weight and not admissibility…. [E]mphasizing the preponderance standard in Rule 702 specifically was made necessary by courts that have failed to apply correctly the reliability requirements of that rule.

Fed. R. Evid. 702 advisory committee's note to 2023 amendment. Ms. Huss's proposal – that the jury decide for itself whether Mr. King's methodology is reliable – flies in the face of the 2023 amendment to Rule 702 and the Court rejects it. In accordance with its obligations under Rule 702, the Court goes on to address whether Mr. King's methodology is reliable.

SharkNinja's main critique of Mr. King's methodology for his opinions regarding the Cool to Explosively Hot Theory is that Mr. King was not able to re-produce an explosive projection when he blended chocolate chips, sweetened condensed milk, and vanilla extract for a longer period of time than Ms. Huss, and that the ingredients he blended were preheated to 121ºF rather than being cool or at room temperature as necessary to test the Cool to Explosively Hot Theory. The Seventh Circuit has "expressly rejected the notion that hands-on testing is an absolute prerequisite to the admission of expert testimony," noting that "when data are available from another source, there's not need to duplicate that information by testing." *Anderson v. Raymond Corp.*, 61 F.4th 505, 510 (7th Cir. 2023); *see also Lapsley v. Xtek, Inc.*, 689 F.3d 802, 815 (7th Cir. 2012) ("We do not require experts to drop a proverbial apple each time they wish to use Newton's gravitational constant in an equation.").

That said, although physical testing is not a strict requirement, Ms. Huss must still show that it is more likely than not that Mr. King's methodology is reliable. Here, Mr. King did not reproduce the characteristics of the Cool to Explosively Hot Theory – described by Ms. Huss as blending of "cool or room temperature" ingredients for a "short amount of time" so as to generate "frictional energy" and heat and pressure that "can cause the hot contents of the cup to explosively project outward without warning," either during blending or when the cup is opened after blending. [Filing No. 11 at 1; Filing No. 11 at 4.] Instead, he preheated the ingredients to 121ºF and blended them for a longer period of time than Ms. Huss, and did not reproduce an explosive projection in any event. [*See* Filing No. 63-2.] Mr. King simply concludes that "[t]he injuries and event description are consistent with the contents being forcefully expelled from the blending cup under pressure and at high temperature." [Filing No. 63-1 at 21.]

The Court acknowledges that "an expert need not wear a lab coat nor cite peer-reviewed studies to reliably lend his expertise to the trier of fact – experience is an equally valuable teacher." *Artis v. Santos*, 95 F.4th 518, 526 (7th Cir. 2024).  But, at bottom, Mr. King still must explain the methodology that he used and how his experience led him to his conclusions.  He did not do so and, moreover, the testing he did perform used different conditions than the Cool to Explosively Hot Theory, making his methodology regarding his opinion that the blender had a design defect based on that theory unreliable.  *See C.W. ex rel. Wood v. Textron, Inc.*, 807 F.3d 827, 834 (7th Cir. 2015) ("When a district court conclude[s] that there is simply too great an analytical gap between the data and opinion proffered such that the opinion amounts to nothing more than the *ipse dixit* of the expert, it is not an abuse of discretion under *Daubert* to exclude that testimony.") (quotation and citation omitted).

b.    Thread Slippage Theory

SharkNinja agrees with Mr. King's premise that "blending creates friction, friction causes heat, and, given enough time, a marathon blending session can eventually generate sufficient heat and pressure within a sealed cup to cause the blended contents to eject out energetically when the cup is opened." [Filing No. 64 at 7.]  It argues, however, that Mr. King's opinions that this can take place after one minute of blending is not supported by testimony or "any other reliable foundation." [Filing No. 64 at 7.]  Specifically, SharkNinja notes that Mr. King blended preheated ingredients for one minute and 49 seconds and "did not identify any thread slippage or pressurized ejection of contents" from the blender cup, and that the Thread Slippage Theory is speculation and unreliable.  [Filing No. 64 at 7.]  SharkNinja also asserts that Mr. King's opinion on the Thread Slippage Theory is irrelevant because Ms. Huss testified that she only blended her ingredients for less than one minute.  [Filing No. 64 at 8.]

Ms. Huss argues in her response that whether Mr. King's opinion regarding the Thread Slippage Theory is speculation is "not for SharkNinja to decide," and that SharkNinja can cross-examine Mr. King regarding his opinion but the opinion should not be excluded.  [Filing No. 70 at 3.]  She notes that Mr. King "diligently and thoroughly examined the cups and threads at issue to determine how Ms. Huss was injured," and that "microscopic analysis of an exemplar's threads shows that the engagement or overlap of the cup and blade threads is approximately half the available thread depth" and "the thread clearances allow the blade assembly to shift within the cup."  [Filing No. 70 at 11.]

SharkNinja asserts in its reply that there is an "analytical gap" in Mr. King's analysis because "[w]hether the blade assembly can 'shift' does not address whether the threads between the blade assembly and the BL660 cup can, in fact, 'slip.'"  [Filing No. 72 at 7.]  It notes that Mr. King did not identify any testing to support his finding and that Ms. Huss does not argue that this theory has been subjected to peer review or publication, is generally accepted in the engineering community, or has a known or potential error rate.  [Filing No. 72 at 7.]

The Court rejects Ms. Huss's argument that SharkNinja can simply cross-examine Mr. King to address any shortcomings in his methodology.  As discussed above, this notion is contrary to the 2023 amendment to Rule 702, which requires the Court to determine whether an expert's methodology is reliable rather than leaving that determination to the jury.  Fed. R. Evid. 702 advisory committee's note to 2023 amendment.

As to SharkNinja's issues with Mr. King's methodology, Mr. King opines that "[a] potential opportunity for venting before sudden separation is present in the intermittent thread design, however, geometric analysis shows that the threaded connection is susceptible to slippage and so it may separate…before venting can occur."  [Filing No. 63-1 at 5.]  He describes the blender's

threading in detail, [Filing No. 63-1 at 6-9], but does not set forth any methodology for how he reached his conclusion that thread slippage could have occurred after less than one minute of blending and caused the contents of Ms. Huss's blender to explode.  Mr. King's methodology regarding his opinion on the Thread Slippage Theory is non-existent and, therefore, unreliable. See *Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 761 (7th Cir. 2010) (expert "cannot simply assert a 'bottom line.'").

c.    <u>The Softening Materials Theory</u>

SharkNinja argues that Mr. King "does not attempt to substantiate his [Softening Materials Theory] with any testing or other reliable foundation," instead simply noting the deflection temperature of the materials that make up the blender's construction and stating that it is likely those materials softened during use.  [Filing No. 64 at 8.]  SharkNinja notes that Mr. King examined the blender but "does not state that he observed any evidence of softening in either the blade assembly or the single-serve cup," that his testing "did not demonstrate any evidence of either component softening," and that he does not cite any support for his theory in scientific literature or otherwise.  [Filing No. 64 at 8-9.]

In response, Ms. Huss argues that physical testing of the Softening Materials Theory is not required and that SharkNinja can address any deficiencies in Mr. King's methodology on cross-examination.  [Filing No. 70 at 10-11.]

SharkNinja argues in its reply that Ms. Huss "provides no evidence that [Mr.] King's theory satisfies any of *Daubert*'s reliability factors or that [his] speculative opinion would be relevant under the facts of Plaintiff's case."  [Filing No. 72 at 8.]

- 13 -

Again, the Court rejects Ms. Huss's contention that SharkNinja can simply address shortcomings in Mr. King's methodology through cross-examination and goes on to consider the issues that SharkNinja raises. Mr. King states in his Report that:

> Drawings produced indicate that the blade assembly threaded section is polypropylene, and the cup is a transparent copolyester ("PCTG"). An overview of the material properties indicates that cup material has a deflection temperature of approximately 200 ºF, while the blade assembly deflection temperature is approximately 100 to 300 ºF. The deflection temperature is indicative of the material's inability to resist deflection under load.
>
> Ms. Huss' description of a pressurized release and sustaining burn injuries indicates that the threaded connection was under load (from internal pressure) and also at an elevated temperature. It is likely that one or both materials experienced some softening due to temperature which contributed to the threads failing to keep the blade assembly fastened to the cup long enough for the pressure to vent.

[Filing No. 63-1 at 10.]

Mr. King does not state that he tested the blender and observed softening of the components' materials or that he employed any other methodology to reach his conclusion. He only states that "[i]t is likely" that the materials "experienced some softening" based on their deflection temperatures, which "contributed to the threads failing to keep the blade assembly fastened." [Filing No. 63-1 at 10.] His speculative conclusion is not supported by any methodology. Mr. King's methodology relating to the Softening Materials Theory is not reliable. *See Downing v. Abbott Lab'ys.*, 48 F. 4th 793, 809 (7th Cir. 2022) (expert testimony properly excluded where expert "[did] not substantively discuss the methodology she used").

d.      The Spontaneous Untwisting Theory

SharkNinja argues that Mr. King simply states that Ms. Huss's observation that the blade assembly untwists itself is consistent with the use of the blender, but "offers no reliable foundation for this opinion," "does not attempt to substantiate his opinion by citing to any scientific literature (or anything at all other than Plaintiff's deposition testimony)," and "did not disclose any evidence

of the BL660 blade assembly untwisting itself based on the slope of the threaded connection during his own testing of the incident recipe." [Filing No. 64 at 9.]

Ms. Huss argues in her response that Mr. King "analyzed Ms. Huss' testimony and threads of exemplar SharkNinja blenders in forming his opinions." [Filing No. 70 at 3-4.]

SharkNinja argues in its reply that Mr. King "does not identify any testing that would support his spontaneous untwisting theory," and notes that his testing with preheated ingredients did not result in the blender cup spontaneously untwisting from the blade assembly. [Filing No. 72 at 8.]

Mr. King's only statement in his Report regarding the Spontaneous Untwisting Theory is the following:

> Ms. Huss' observation that the blade assembly "…kind of untwists itself the rest of the way…" is consistent with the force from internal pressure being transferred into a rotational motion due to the slope of the threaded connection between the cup and blade assembly."

[Filing No. 63-1 at 6.] He does not state that he tested this theory and observed spontaneous untwisting or set forth any other methodology that he used in reaching this conclusion. He simply baldly states that Ms. Huss's observation is consistent with the use of the blender and the slope of the threaded connection. Mr. King's methodology regarding the Spontaneous Untwisting Theory is speculative and not reliable. *See Downing*, 48 F. 4th at 809; *Moore v. Nat'l Presto Indus., Inc.*, 603 F. Supp. 3d 676, 682 (W.D. Wis. 2022) (excluding Mr. King's opinions regarding possible design defects in pressure cooker and stating that his report "is essentially speculation about possible explanations for the incident").

The Court finds that Ms. Huss has not sustained her burden of showing by a preponderance of the evidence that Mr. King's methodology as it relates to the Cool to Explosively Hot Theory,

the Thread Slippage Theory, the Softening Materials Theory, or the Spontaneous Untwisting Theory is reliable.

### 3.    *Whether Mr. King's Testimony Will Aid the Trier of Fact*

SharkNinja argues that Mr. King's opinions will not aid the trier of fact because they are speculative in nature and not based on a reliable methodology.  [Filing No. 64 at 8-9.]

In her response, Ms. Huss argues that Mr. King's opinions will aid the jury because "[t]here is a very logical relationship between Mr. King's testimony and the factual issues in the case," and "Mr. King will be able to explain [issues with the blender] effectively, and help the jury decide if Plaintiff's blender was defective and caused her injuries."  [Filing No. 70 at 9.]  She asserts that Mr. King's opinions "are therefore a good fit for the case."  [Filing No. 70 at 10.]

In its reply, SharkNinja reiterates its arguments that Mr. King's opinions are speculative and, consequently, will not aid the trier of fact.  [*See, e.g.*, Filing No. 72 at 7.]

"Expert testimony is admissible only when it will assist the trier of fact, and fact-intensive findings are within lay competence and are the prerogative of the jury."  *Aponte v. City of Chicago*, 2011 WL 1838773, at *3 (N.D. Ill. May 12, 2011); *see also Deimer v. Cincinnati Sub-Zero Prods., Inc.*, 58 F.3d 341, 345 (7th  Cir. 1995) (expert testimony is inadmissible if it does not aid the trier of fact, and the testimony must "fit the issue to which the expert is testifying [and be] tied to the facts of the case") (quotations and citations omitted).

As discussed above, Mr. King's opinions are not grounded in a reliable methodology – they are not based on any physical testing and Mr. King does not set forth any other methodology to explain how he reached his conclusions.  The speculative nature of his opinions relating to all four design defect theories will not aid the trier of fact.  The Court finds that Ms. Huss has not shown that it is more likely than not that Mr. King's testimony will aid the trier of fact.

In sum, the Court finds in exercising its gatekeeping function that Ms. Huss has not sustained her burden of showing by a preponderance of the evidence that Mr. King's methodology is reliable and that his opinions would aid the trier of fact.[2]  Consequently, the Court **GRANTS** SharkNinja's Motion to Exclude Expert Testimony of Derek King.  [Filing No. 63.][3]  Mr. King may not provide expert opinion testimony in this case.

### III.
#### MOTION FOR SUMMARY JUDGMENT

#### A.  Standard of Review

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(a).  On summary judgment, a party must show the Court what evidence it has that would convince a trier of fact to accept its version of the events.  *Johnson v. Cambridge Indus.*, 325 F.3d 892, 901 (7th Cir. 2003).  "'Summary judgment is not a time to be coy.'"  *King v. Ford Motor Co.*, 872 F.3d 833, 840 (7th Cir. 2017) (quoting *Sommerfield v. City of Chicago*, 863 F.3d 645, 649 (7th Cir. 2017)).  Rather, at the summary judgment stage, "[t]he parties are required to put their evidentiary cards on the table."  *Sommerfield*, 863 F.3d at 649.

The moving party is entitled to summary judgment if no reasonable fact-finder could return a verdict for the non-moving party.  *Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir. 2009).  The Court views the record in the light most favorable to the non-moving party and draws all reasonable

---

[2] Given these findings, the Court need not and will not consider whether Mr. King's opinions regarding defect causation and proposed alternative designs are admissible.

[3] The Court is aware of the recent decision in *Brown v. SharkNinja Operating, LLC*, --- F. Supp. 3d ----, 2024 WL 4269671 (N.D. Ga. Sept. 20, 2024), in which a Northern District of Georgia court denied SharkNinja's Motion to Exclude Mr. King's expert opinion in a factually similar case, finding that any shortcomings in Mr. King's methodology could be addressed through cross-examination.  *Id.* at *6.  As discussed above, this Court respectfully disagrees with that finding and *Brown* is not binding on this Court in any event.

inferences in that party's favor.  *Darst v. Interstate Brands Corp.*, 512 F.3d 903, 907 (7th Cir. 2008).  It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder.  *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 630 (7th Cir. 2011).

Each fact asserted in support of or in opposition to a motion for summary judgment must be supported by "a citation to a discovery response, a deposition, an affidavit, or other admissible evidence."  S.D. Ind. L.R. 56-1(e).  And each "citation must refer to a page or paragraph number or otherwise similarly specify where the relevant information can be found in the supporting evidence."  *Id.*  The Court need only consider the cited materials and need not "scour the record" for evidence that is potentially relevant.  *Grant v. Trustees of Ind. Univ.*, 870 F.3d 562, 572-73 (7th Cir. 2017) (quotations omitted); *see also* Fed. R. Civ. P. 56(c)(3); S.D. Ind. L.R. 56-1(h). Where a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact, the Court may consider the fact undisputed for purposes of the summary judgment motion.  Fed. R. Civ. P. 56(e)(2).

In deciding a motion for summary judgment, the Court need only consider disputed facts that are material to the decision.  A disputed fact is material if it might affect the outcome of the suit under the governing law.  *Hampton v. Ford Motor Co.*, 561 F.3d 709, 713 (7th Cir. 2009).  In other words, while there may be facts that are in dispute, summary judgment is still appropriate if those facts are not outcome determinative.  *Harper v. Vigilant Ins. Co.*, 433 F.3d 521, 525 (7th Cir. 2005).  Fact disputes that are irrelevant to the legal question will not be considered.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

### B.  Statement of Facts

The following Statement of Facts takes into account the Court's rulings regarding the scope of Ms. Huss's claims and the exclusion of Mr. King's expert opinions, and is set forth pursuant to the standard detailed above.  The facts stated are not necessarily objectively true, but as the summary judgment standard requires, the undisputed facts and the disputed evidence are presented in the light most favorable to "the party against whom the motion under consideration is made." *Premcor USA, Inc. v. Am. Home Assurance Co.*, 400 F.3d 523, 526-27 (7th Cir. 2005).

#### 1.  *The August 23, 2021 Incident*

On August 23, 2021, Ms. Huss attempted to use her BL660 SharkNinja blender to make a fudge recipe.  [Filing No. 65-1 at 6; Filing No. 65-1 at 11.]  Prior to that day, she had probably used her blender more than 50 times.  [Fling No. 65-1 at 4.]  To make her fudge recipe, Ms. Huss first placed a mixing bowl containing chocolate chips and possibly condensed milk in the microwave.  [Filing No. 65-1 at 13; Filing No. 65-1 at 16; Filing No. 65-6 at 4.]  Ms. Huss "guess[es]" that she microwaved the chocolate chip mixture for a "total cook time" between a "minute" and a "minute and a half."  [Filing No. 65-1 at 13-14.]  She was "supposed to do it for like 10 to 30 seconds [at] a time, take it out, [and] mix it to get the consistency correct."  [Filing No. 65-1 at 13.]  She thought that the ingredients were "under the lukewarm temperature" when she placed them in the blender cup.  [Filing No. 65-1 at 15.]

After microwaving was complete, Ms. Huss transferred the heated chocolate chip mixture into the blender's single-serve cup and blended it for probably less than a minute.  [Filing No. 65-1 at 18; Filing No. 65-5 at 4.]  After blending, Ms. Huss attempted to open the single-serve cup and when she began to twist open the lid, the lid "shot off the cup and across the room," and then

there was an "explosion of scalding hot fudge" that burned Ms. Huss's face, chest, arms, and hands. [Filing No. 65-1 at 18-19; Filing No. 65-5 at 4.]

### 2.  Dr. Bryson Brewer's Expert Opinion

SharkNinja retained Dr. Bryson Brewer to perform "replication testing" using a BL660 blender, where he prepared the fudge recipe that Ms. Huss used on August 23, 2021 with the same ingredients, both heated and at room temperature.  [Filing No. 65-3 at 13-16.]  Dr. Brewer found that blending room temperature ingredients for nearly one minute did not generate appreciable pressure inside the BL660 cup and did not result in content temperatures that were capable of causing burns.  [Filing No. 65-3 at 13-14; Filing No. 65-3 at 17.]  When ingredients were heated to above 121ºF – a temperature greater than demonstrated in Mr. King's testing – the ingredients were ejected from the blender.  [Filing No. 65-3 at 4; Filing No. 65-3 at 22.]  Dr. Bryson opined that blending hot contents in the BL660 constituted misuse of the appliance and was contrary to warnings and instructions for the BL660.  [Filing No. 65-3 at 4; Filing No. 65-3 at 22.]

### C.  Discussion

SharkNinja argues in support of its Motion for Summary Judgment that Ms. Huss must show that it failed to exercise reasonable care under the circumstances in designing the blender and must present evidence that the blender's design rendered it unreasonably dangerous.  [Filing No. 66 at 11.]  It contends that Ms. Huss must present expert evidence to establish a design defect and that she has not done so as discussed more specifically in its Motion to Exclude Expert Testimony of Derek King.  [Filing No. 66 at 12-13.]

Ms. Huss argues in response that Mr. King's opinion should not be excluded and that "[t]here are disputes of material fact on whether the subject blender was defective based on Ms. Huss' use, which means [SharkNinja] is not entitled to summary judgment."  [Filing No. 71 at 10.]

- 20 -

In its reply, SharkNinja argues that Ms. Huss has acknowledged that she must present expert evidence that the blender was unreasonably dangerous and in a condition not contemplated by a reasonable person, and cannot create a factual dispute by pointing to her testimony about the temperature of the ingredients when she put them in the blender. [Filing No. 73 at 10.] It reiterates its argument that Ms. Huss has not presented expert evidence that "blending 'not hot' or 'lukewarm' ingredients for any length of time in the BL660 can cause a pressurized release of hot contents," and that "the only relevant, admissible evidence shows that hot ingredients must have been used for pressure to accumulate in the cup and its contents to reach scalding levels." [Filing No. 73 at 10.] SharkNinja notes that Mr. King's only testing involved ingredients that were already hot and argues that Ms. Huss is "forced into a dilemma" because "[i]f [Mr.] King's opinion is that blending hot ingredients in a BL660 can cause pressurization and burns, then there is no factual dispute," but "if [Mr.] King's opinion is that blending cool or lukewarm ingredients in a BL660 can cause dangerous pressurization and burns, then he has not pointed to the reliable facts, data, or methods that would support such a claim." [Filing No. 73 at 11 (emphasis omitted).] It notes that "[e]ven if a reasonable jury could believe Plaintiff's testimony about the [temperature of the ingredients], Plaintiff lacks any admissible evidence showing that the BL660 is capable of turning those ingredients into explosively hot molten fudge." [Filing No. 73 at 12 (emphasis omitted).]

The IPLA "governs all claims brought by a consumer against a manufacturer for physical harm caused by its product, regardless of legal theory." *Kaiser*, 947 F.3d at 1007. Under the IPLA, "a manufacturer who places 'into the stream of commerce any product in a defective condition unreasonably dangerous to any user or consumer…is subject to liability for physical harm caused by that product.'" *Id.* (quoting Ind. Code § 34-20-2-1).

A plaintiff bringing an action under the IPLA "must establish that (1) he or she was harmed by a product; (2) the product was sold 'in a defective condition unreasonably dangerous to any user or consumer'; (3) the plaintiff was a foreseeable user or consumer; (4) the defendant was in the business of selling the product; and (5) the product reached the consumer or user in the condition it was sold." *Bourne v. Marty Gilman, Inc.*, 452 F.3d 632, 635 (7th Cir. 2006). "A plaintiff can satisfy the second element by showing a design defect, a manufacturing defect, or a failure to warn." *Piltch v. Ford Motor Co.*, 778 F.3d 628, 632 (7th Cir. 2015).

Design defect liability is grounded in negligence and a plaintiff "must 'establish that the manufacturer or seller failed to exercise reasonable care under the circumstances in designing the product.'" *Kaiser*, 947 F.3d at 1008 (quoting Ind. Code § 34-20-2-2). More generally, "[n]egligence claims have three elements: (1) a duty owed by the defendant to the plaintiff, (2) a breach of that duty and (3) injury to the plaintiff proximately caused by the defendant's breach." *Hayden v. Franciscan Alliance, Inc.*, 131 N.E.3d 685, 693 (Ind. Ct. App. 2019). "Whether a product is unreasonably dangerous is a distinct inquiry and must be established" for a design defect claim. *Kaiser*, 947 F.3d at 1008. "A product is unreasonably dangerous when it 'exposes the user or consumer to a risk of physical harm to an extent beyond that contemplated by the ordinary consumer who purchases the product with the ordinary knowledge about the product's characteristics common to the community of consumers.'" *Id.* (quoting Ind. Code § 34-6-2-146).

At the outset, the Court considers whether expert evidence is necessary in order for Ms. Huss to establish a design defect that made the blender unreasonably dangerous. In applying Indiana law, this Court must do its "best to predict how the Indiana Supreme Court would decide" the issue. *Webber v. Butner*, 923 F.3d 479, 482 (7th Cir. 2019). Some federal courts applying Indiana law have held that expert evidence is necessary in order to establish a design defect that

made a product unreasonably dangerous where the issue is not within a layperson's understanding. *See, e.g.*, *Hartman v. EBSCO Indus., Inc.*, 758 F.3d 810, 818 (7th Cir. 2014) (stating, in case involving alleged design defect in rifle, that "[u]nder Indiana law, expert testimony is required in order to show a design defect where the defect's existence depends on matters beyond the common understanding of lay jurors"); *Lyons v. Leatt Corp.*, 2017 WL 4117775, at *8 (N.D. Ind. Sept. 14, 2017) (finding in case involving neck brace used for motorsports that "[e]xpert testimony is needed under Indiana law to establish both defect and causation when the issue is not within the understanding of a lay person") (quotation and citation omitted). But the Indiana Supreme Court has found that proof of negligence in connection with a design defect claim under the IPLA "is determined from the evidence itself and [does] not require an opinion witness's declaration thereof." *TRW Vehicle Safety Sys., Inc. v. Moore*, 936 N.E.2d 201, 209 (Ind. 2010) (alleged design defect in seat belt system). Consistent with the Indiana Supreme Court's holding in *TRW*, the Court finds that Ms. Huss was not required to present expert evidence to show that the blender had a design defect that made it unreasonably dangerous.

That said, Ms. Huss must still present sufficient evidence – whether from an expert or not – to show that a design defect made the blender unreasonably dangerous and she has not done so. Mr. King's testimony does not help her because, as discussed above, his methodology regarding the Cool to Explosively Hot Theory, the Thread Slippage Theory, the Softening Materials Theory, and the Spontaneous Untwisting Theory is not reliable and his testimony and opinions would not assist the trier of fact so, consequently, Ms. Huss cannot rely upon his opinions to show that the blender had a design defect. Ms. Huss has not presented any other evidence related to a design defect. She could have presented evidence which replicated the explosion under the same conditions that are consistent with her version of events, but she has not done so. Consequently,

she has not shown that the blender had a defect that rendered it unreasonably dangerous when used in compliance with its accompanying warnings, and her design defect claim under the IPLA fails as a matter of law.   Accordingly, the Court **GRANTS** SharkNinja's Motion for Summary Judgment.   [Filing No. 65.]

**IV.**
**CONCLUSION**

For the foregoing reasons, the Court **GRANTS** SharkNinja's Motion to Exclude Expert Testimony of Derek King, [63], and its Motion for Summary Judgment, [65].   Final judgment shall enter accordingly.

Date: 1/21/2025

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

**Distribution via ECF only to all counsel of record**